**Opinion filed March 7, 2024**



In The

# Eleventh Court of Appeals

_____

## No. 11-22-00273-CV

_____

### CITY OF STEPHENVILLE, SELF-INSURED, Appellant

### V.

### ANNA BELEW, JODI BELEW, MINOR CB, AND MINOR RB, Appellees

**On Appeal from the 266th District Court**
**Erath County, Texas**
**Trial Court Cause No. CV34200**

## O P I N I O N

In this workers' compensation death benefits case, we are confronted with two issues of first impression: (1) is pancreatic cancer, which is claimed to have arisen from a first responder's (a firefighter or emergency medical technician) on-the-job-activities, considered to be a recognized cancer that originates from the course and scope of the first responder's employment, and (2) which party, the claimant or the

employer/insurer, has the burden to prove that the cancerous condition is a compensable injury. TEX. LAB. CODE ANN. § 408.001(a) (West 2015); TEX. GOV'T CODE ANN. § 607.055 (West 2021).

In the matter before us, we must first determine what evidence that a first responder-claimant—here, a firefighter—who suffers from a cancerous condition must present to show that he is entitled to a statutory presumption that his cancer developed during the course and scope of his employment as a firefighter, pursuant to the version of Section 607.055 of the Government Code that was in effect at the time the claim for benefits arose.[1] *See* Act of June 17, 2005, 79th Leg., R.S. ch. 695, § 3, 2005 Tex. Gen. Laws 1689, 1690–91 (amended 2019 and 2021) (current version at GOV'T § 607.055). Second, we must determine whether the necessary burden was met and whether either party to this appeal is entitled to summary judgment.

Appellees are the beneficiaries of Michael Belew, a firefighter for the City of Stephenville (the City) who passed away in 2014 after a battle with pancreatic cancer. Appellees seek to recover workers' compensation death benefits from the City, a self-insurer under the Texas Workers Compensation Act (TWCA or the Act), as a result of Michael's service as a firefighter with the City. Appellees assert that Michael developed pancreatic cancer during his employment with the City. The City has maintained that Michael did not suffer a compensable injury. As their claim percolated through the Texas Department of Insurance, Division of Workers' Compensation (TDI-DWC) administrative process, Appellees prevailed at every stage. Upon the completion of this process, the City filed suit for judicial review in

---

[1]All references throughout this opinion to the provisions of Subchapter B, including Section 607.055, are to the 2005 version of the statute and its provisions unless otherwise indicated. Michael Belew's cancer diagnosis and subsequent death occurred in 2014, prior to the 2019 statutory amendments to Chapter 607. Consequently, the 2005 iteration of the statute is the version that is applicable to this appeal. *See* GOV'T § 311.022 (West 2013) ("A statute is presumed to be prospective in its operation unless expressly made retrospective.").

the 266th District Court of Erath County to challenge the TDI-DWC's determinations. Both parties moved for summary judgment on the issue of whether Appellees had met the evidentiary requirements of Section 607.055. After a hearing, the trial court granted Appellees' motion and denied the City's motion.

The City raises two issues on appeal and contends that: (1) the trial court erred when it sustained Appellees' objections to portions of the City's summary judgment evidence, and (2) Michael did not sustain a compensable injury in the form of an occupational disease under Chapter 607 of the Government Code during his service as a firefighter for the City; that is, Section 607.055's presumption of causation is inapplicable to the pancreatic cancer that Michael purportedly developed during his service as a firefighter for the City. Based on the record before us and our interpretation of the relevant statutory provisions, we conclude that (1) Section 607.055 imposes an initial burden on a worker's compensation claimant to establish a general causal link between the cancerous condition that he developed during his employment and the specific exposures identified in the statute, pursuant to the criteria promulgated by the International Agency for Research on Cancer (IARC), (2) Appellees failed to carry their summary judgment burden, and (3) the City established that it is entitled to summary judgment. Accordingly, and for the reasons discussed below, we reverse and render.

## I. *Background*

Michael was employed as a firefighter and emergency medical technician by the City, who is a self-insurer under the TWCA. *See generally* LAB. §§ 407.001–.133 (West 2015 & Supp. 2023). He regularly responded to the scene of fires and other firefighting activities while employed by the City. During his employment, Michael received periodic physical examinations that never revealed any evidence of the development of pancreatic cancer. GOV'T § 607.052(a). Further, neither

3

Michael nor his wife, Anna, smoked or used any tobacco products. *Id.* § 607.052(b)(4).

In June of 2014, after serving more than a dozen years in this capacity for the City (and also serving as a volunteer firefighter and emergency medical technician for the nearby City of Dublin), Michael noticed pain, as well as redness and swelling, in and around his left thigh. He sought treatment and was diagnosed with deep vein thrombosis; blood thinners were prescribed. Michael's condition did not improve and in July he and Anna presented to the emergency room of a Fort Worth hospital. After a series of tests over the course of that day, Michael was diagnosed with metastatic pancreatic cancer; he passed away shortly thereafter in early August. Anna and Michael's children, as his legal beneficiaries, applied for workers' compensation death benefits under the TWCA; the disposition of the ensuing proceedings culminated in this appeal.

The TDI-DWC administers claims for benefits under the TWCA. In the underlying administrative proceedings, after a benefits-review conference, a TDI-DWC contested-case-hearing officer determined that Michael had sustained a compensable injury in the form of an occupational disease during the course and scope of his employment with the City. The hearing officer's determination was based, in part, on the officer's interpretation and application of Section 607.055—a statutory presumption of causation, as discussed below, that is specifically applicable to certain firefighters. In formulating its determination, the hearing officer also relied on the holdings from two previous appeals panel decisions issued by the TDI-DWC's appellate division.

In the first decision, Appeal No. 150098-S, the appeals panel addressed a firefighter's claim that her cancer (multiple myeloma) was a covered condition under Section 607.055. After the conclusion of the contested-case hearing, the hearing

4

officer determined that the claimant failed to establish the statutory presumption of causation because she did not present evidence that multiple myeloma is directly caused by firefighting activities or the statutorily relevant exposures. The appeals panel disagreed and concluded that the plain language of the statute, and the legislature's apparent intent in enacting it, supported the conclusion that the claimant had met the threshold presumption as provided by Section 607.055.

The appeals panel further concluded that the statutory presumption in Section 607.055 shifted the burden of proof from the claimant to the employer by creating a presumption of causation in favor of the claimant. The panel quoted the Texas Supreme Court's decision in *Gen. Motors Corp. v. Saenz* for the proposition that the presumption's "effect is to shift the burden of producing evidence to the party against whom it operates." 873 S.W.2d 353, 359 (Tex. 1993). The appeals panel ultimately concluded that the hearing officer failed to properly apply the statutory presumption by requiring that the claimant present direct and unequivocal evidence that her multiple myeloma was caused by the relevant exposures as designated in the statute because the legislature, by creating the presumption and providing a standard whereby the presumption could be rebutted, intended to shift that burden to the employer.

The second prior appeals panel decision, Appeal No. 151156, relied on this reasoning when the appeals panel addressed whether Section 607.055 applied to a claim that involved essentially the same fact pattern as in the case before us: a firefighter-claimant who suffered from pancreatic cancer and sought the coverage of the presumption in Section 607.055. That case also involved the same evidence (the IARC's 98th Monograph, discussed in detail below) that is primarily relied upon by the parties in the case before us. Applying its previous analysis of the presumption's burden-shifting effect, the appeals panel stated that because the 98th Monograph

"references evidence-based medicine on firefighters developing types of cancer, *including pancreatic cancer*, under the title of 'Studies of Cancer in Humans,'" and because Section 607.055 carries a low threshold causation standard, the evidence was sufficient to establish that Section 607.055 applied to the claimant's pancreatic cancer (emphasis added). As such, the appeals panel reversed the hearing officer's determination that the claimant's pancreatic cancer was not compensable and remanded the matter to the hearing officer for further proceedings.[2]

By relying on these appeals panel decisions, and in applying its reasoning to Michael's claim, the hearing officer noted that a nearly identical fact pattern existed and thus Section 607.055 applied to the pancreatic cancer that Michael developed. The City appealed the hearing officer's decision, and the appeals panel adopted the hearing officer's decision without issuing a written opinion.

With its administrative remedies exhausted, the City filed suit for judicial review in the 266th District Court of Erath County; in its suit, the City only challenged and addressed the application of the statutory presumption. All other pertinent issues in the underlying claim remain pending before the TDI-DWC for administrative adjudication.[3] In the trial court below, the parties filed cross-motions for summary judgment. Appellees filed a hybrid no-evidence and traditional motion for summary judgment. In support of its motion, the City submitted, in addition to other evidence, the affidavits of two physicians—Dr. Suzanne Novak and Dr. Patricia Rosen—and an epidemiological study of mortality and cancer incidents in a pooled cohort of U.S. firefighters from San Francisco, Chicago, and Philadelphia

---

[2]On remand, the hearing officer determined that the claimant had established the firefighter's presumption, based on the appeals panel's holding. The employer filed suit for judicial review to challenge the hearing officer's determination but later moved to non-suit its petition, which resulted in the finality of the previous administrative decision issued by the appeals panel in Appeal No. 151156.

[3]Therefore, irrespective of our disposition of this appeal, the ultimate issue of causation must first be addressed in the administrative proceedings and, if necessary, litigated in the district court de novo.

(the Daniels study). Appellees objected to these exhibits, and the trial court sustained their objections and excluded this evidence. Following a hearing, the trial court granted Appellees' motion on both no-evidence and traditional grounds and denied the City's motion. This appeal followed.

## II. *Claim Adjudication Under the TWCA*

The TWCA provides that the recovery of workers' compensation benefits is the exclusive remedy for a legal beneficiary of an employee that is covered by workers' compensation insurance for either a work-related death or injury. *See* LAB. §§ 401.011(13), 408.001–.002. A designated insurer, whether it be an insurance carrier or a self-insured employer, shall pay death benefits to a legal beneficiary if a compensable injury results in the employee's death. *See id.* § 408.181(a). Under the Act, an "injury" means damage or harm to the physical structure of the body and a disease, including an occupational disease, or infection that naturally results from the damage or harm. *Id.* § 401.011(26). A "compensable injury" is an injury that arises out of the course and scope of the employee's employment. *Id.* § 401.011(10).

Here, the parties agree that, for purposes of this appeal, the City is an insurer and Michael is a qualified firefighter. As discussed below, the primary question to be resolved in this appeal is whether Section 607.055 applies to the development of Michael's pancreatic cancer, which, if it does, would relieve Appellees of the burden to prove causation—namely, that Michael's cancer arose out of the course and scope of his employment as a firefighter for the City. *See id.*

The adjudication of a claim for benefits under the Act begins at the administrative level, and disputed claims proceed through a three-step process: (1) a benefit-review conference, (2) a contested-case hearing, and (3) if invoked, an administrative appeal. *Tex. Workers' Comp. Comm'n v. Garcia*, 893 S.W.3d 504, 514 (Tex. 1995); *see* LAB. §§ 410.021–.034, 410.151–.169, 410.201–.209; *see also*

7

*State Office of Risk Mgmt. v. Martinez*, 539 S.W.3d 266, 268–69 (Tex. 2017). A party who has exhausted its administrative remedies and is aggrieved by the TDI-DWC's final decision may seek judicial review. LAB. §§ 410.251–.252; *Cont'l Cas. Ins. v. Functional Restoration Assocs.*, 19 S.W.3d 393, 398 (Tex. 2000).

If a party seeks judicial review of a final TDI-DWC decision regarding the "compensability or eligibility for or the amount of . . . death benefits," the district court reviews the final decision under a modified de novo standard of review. *Rodriguez v. Serv. Lloyds Ins. Co.*, 997 S.W.2d 248, 253 (Tex. 1999); *see* LAB. § 410.304. The modified de novo review standard permits the factfinder to be informed of the TDI-DWC's final decision; however, the factfinder is not required to accord it any weight. *See Garcia*, 893 S.W.3d at 515; *see also* LAB. §§ 410.303–.304.

A. *The Firefighter's Presumption*

Texas has joined a growing trend in other states across the nation[4] by enacting Chapter 607, Subchapter B of the Government Code. The statute in effect at the time that Michael's claim arose provides that, for purposes of benefit claims, qualified first responders—namely firefighters and emergency medical technicians—who suffer certain injuries or diseases that result in death or disability are presumed to have suffered the injury or disease in the course and scope of their employment. *See* GOV'T § 607.051–.059. Colloquially labeled the "firefighter's

---

[4]Assorted versions of the firefighter's presumption have been enacted, including specifically in the workers' compensation context, by several states. *See, e.g.*, ALASKA STAT. ANN. § 23.30.121 (West 2008); ARIZ. REV. STAT. ANN. § 23-901.09; COLO. REV. STAT. ANN. § 8-41-209; IDAHO CODE ANN. § 72-438; 820 ILL. COMP. STAT. ANN. 305/6; LA. STAT. ANN. § 33:2011; ME. REV. STAT. ANN. tit. 39-A, § 328-B; MD. CODE ANN., LAB. & EMPL. § 9-503; MONT. CODE ANN. § 39-71-1401; NEV. REV. STAT. ANN. § 617.453; N.H. REV. STAT. ANN. § 281-A:17; N.M. STAT. ANN. § 52-3-32.1; OR. REV. STAT. ANN. § 656.802; TENN. CODE ANN. § 7-51-201; UTAH CODE ANN. § 34A-3-113; VT. STAT. ANN. tit. 21, § 601; VA. CODE ANN. § 65.2-402; W. VA. CODE ANN. § 23-4-1; *see also* 2 LEX K. LARSON, LARSON'S WORKERS' COMPENSATION, DESK EDITION § 52.07[2] (Matthew Bender, Rev. Ed.) (2023).

presumption," this statutory rule generally enables state governments to shift the burden of proving causation from the claimants to their employers. However, this presumption may be rebutted.

Section 607.055 applies the rebuttable presumption established in Chapter 607 to certain cancers that a firefighter or an emergency medical technician develop during their employment; such cancers are rebuttably presumed to originate from and develop during the course and scope of their employment. The version of Section 607.055 that is applicable to this appeal states:

> (a)   A firefighter or emergency medical technician who suffers from cancer resulting in death or total or partial disability is presumed to have developed the cancer during the course and scope of employment as a firefighter or emergency medical technician if:
>
>> (1)   the firefighter or emergency medical technician:
>>
>>> (A)   regularly responded on the scene to calls involving fires or fire fighting; or
>>>
>>> (B)   regularly responded to an event involving the documented release of radiation or a known or suspected carcinogen while the person was employed as a firefighter or emergency medical technician; and
>>
>> (2)   the cancer is known to be associated with fire fighting or exposure to heat, smoke, radiation, or a known or suspected carcinogen, as described by Subsection (b).
>
> (b)   *This section applies only to a type of cancer* that *may be caused* by exposure to heat, smoke, radiation, or a known or suspected carcinogen *as determined by the [IARC]*.

GOV'T § 607.055 (emphasis added). In this case, the City contends that Michael's pancreatic cancer does not meet the requirements of Section 607.055 and therefore the presumption of causation does not apply to his circumstances. For the reasons stated below, we agree with the City.

### III. *Standards of Review – Summary Judgment*

We review a trial court's grant of summary judgment de novo. *Fort Worth Transp. Auth. v. Rodriguez*, 547 S.W.3d 830, 837 (Tex. 2018). To prevail under the traditional summary judgment standard, the movant has the burden to establish that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(a), (c); *ConocoPhillips Co. v. Koopmann*, 547 S.W.3d 858, 865 (Tex. 2018). If the movant meets its summary judgment burden, the burden shifts to the nonmovant to raise a genuine issue of material fact that would preclude the grant of summary judgment. *Amedisys, Inc. v. Kingwood Home Health Care, LLC*, 437 S.W.3d 507, 510–11 (Tex. 2014).

To determine if a genuine issue of material fact exists, we review the evidence in the light most favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *KMS Retail Rowlett, LP v. City of Rowlett*, 593 S.W.3d 175, 181 (Tex. 2019). We credit evidence favorable to the nonmovant if reasonable jurors could do so, and we disregard contrary evidence unless reasonable jurors could not. *Samson Expl., LLC v. T.S. Reed Props., Inc.*, 521 S.W.3d 766, 774 (Tex. 2017); *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). The evidence raises a genuine issue of material fact if reasonable and fair-minded jurors could differ in their conclusions in light of all of the summary judgment evidence presented. *Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 755 (Tex. 2007).

Generally, when parties move for summary judgment on both traditional and no-evidence grounds, we first consider the no-evidence motion. *KMS Retail*, 593 S.W.3d at 181. If the non-movant fails to overcome its no-evidence burden on any claim, we need not address the traditional motion to the extent that it addresses the same claim. *Lightning Oil Co. v. Anadarko E&P Onshore, LLC*, 520 S.W.3d 39, 45

(Tex. 2017). We review a no-evidence motion for summary judgment under the same legal sufficiency standard that we use when reviewing the grant of a directed verdict. *Merriman v. XTO Energy, Inc.*, 407 S.W.3d 244, 248 (Tex. 2013). Pursuant to this standard, and "[t]o defeat a no-evidence motion, the nonmovant must produce at least a scintilla of evidence raising a genuine issue of material fact as to the challenged elements." *KMS Retail*, 593 S.W.3d at 181; *see* TEX. R. CIV. P. 166a(i). Evidence is no more than a scintilla if it is "so weak as to do no more than create a mere surmise or suspicion of a fact." *KMS Retail*, 593 S.W.3d at 181 (citing *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003)).

When cross-motions for summary judgment are filed, each party bears the burden to establish that it is entitled to judgment as a matter of law. *City of Garland v. Dallas Morning News*, 22 S.W.3d 351, 356 (Tex. 2000). Thus, when the trial court grants one motion and denies the other, we must consider all of the summary judgment evidence, determine all questions presented, and render the judgment that the trial court should have rendered. *Lightning Oil*, 520 S.W.3d at 45 (citing *Merriman*, 407 S.W.3d at 248).

We review a trial court's exclusion of summary judgment evidence for an abuse of discretion. *Starwood Mgmt., LLC v. Swaim*, 530 S.W.3d 673, 678 (Tex. 2017). If the trial court abused its discretion when it sustained an objection to summary judgment evidence, we must determine whether the exclusion of the evidence probably resulted in the rendition of an improper judgment. *See* TEX. R. APP. P. 44.1(a)(1); *Gunn v. McCoy*, 554 S.W.3d 645, 668 (Tex. 2018). Whether an erroneous exclusion of evidence probably caused the rendition of an improper judgment is "a judgment call entrusted to the sound discretion of good sense of the reviewing court from an evaluation of the whole case." *First Emps. Ins. Co. v. Skinner*, 646 S.W.2d 170, 172 (Tex. 1983).

IV. *Analysis*

The parties disagree as to the meaning and intent of Section 607.055. Because, and by its own terms, Section 607.055 applies only to "type[s] of cancer that may be caused by exposure to heat, smoke, radiation, or a known or suspected carcinogen *as determined by the [IARC]*," the parties' summary judgment evidence understandably focused on this point. GOV'T § 607.055(b) (emphasis added). Here, our task is twofold. First, we must ascertain the meaning of Section 607.055. Second, we must then apply its meaning to the parties' summary judgment evidence and determine whether either party carried its burden under that standard.

A. *Principles of Statutory Interpretation*

We review questions of statutory interpretation de novo. *Youngkin v. Hines*, 546 S.W.3d 675, 680 (Tex. 2018). "When construing a statute, our primary objective is to ascertain and give effect to the Legislature's intent." *TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 439 (Tex. 2011); *see* GOV'T § 312.005.

We begin by examining the plain meaning of the statute's language. *Crosstex Energy Servs., L.P. v. Pro Plus, Inc.*, 430 S.W.3d 384, 389–90 (Tex. 2014). We derive legislative intent from the statute as a whole rather than from isolated portions of it. *City of San Antonio v. City of Boerne*, 111 S.W.3d 22, 25 (Tex. 2003). That is, we read statutes contextually to give effect to every word, clause, and sentence because every word and phrase is presumed to have been used intentionally, with a meaning and a purpose. *Fort Worth Transp. Auth.*, 547 S.W.3d at 838. "Words and phrases shall be read in context and construed according to the rules of grammar and common usage." GOV'T § 311.011; *Cadena Commercial USA Corp. v. Tex. Alcoholic Beverage Comm'n*, 518 S.W.3d 318, 325 (Tex. 2017).

"If the statute is clear and unambiguous, we must read the language according to its common meaning 'without resort to rules of construction or extrinsic aids.'"

*Crosstex Energy Servs.*, 430 S.W.3d at 389 (quoting *State v. Shumake*, 199 S.W.3d 279, 284 (Tex. 2006)); *but see* GOV'T § 311.023 (permitting courts to consider legislative history and other construction aids regardless of ambiguity). And if a statute is unambiguous, we adopt the interpretation that is supported by the statute's plain language unless such an interpretation would yield an absurd result. *TGS-NOPEC*, 340 S.W.3d at 439 (citing *Tex. Dep't of Protective & Regulatory Servs. v. Mega Child Care*, 145 S.W.3d 170, 177 (Tex. 2004)). "A statute is ambiguous if its words are susceptible to two or more reasonable interpretations and we cannot discern legislative intent from the language alone." *Fort Worth Transp. Auth.*, 547 S.W.3d at 838.

B.  *The Meaning of Section 607.055*

In its second issue, the City argues that Michael did not sustain a compensable injury in the form of an occupational disease under the criteria set forth in Chapter 607. In support of this contention, the City argues that the plain language of Section 607.055 requires that, for purposes of compensability, a claimant must establish that the IARC, and only the IARC, has affirmatively *determined* that there "may be a causal association between pancreatic cancer and the activities of firefighting." The City further contends that a review of the relevant IARC literature shows that the IARC has never made such a determination.

In response, Appellees focus their arguments on what *constitutes* a "determination" by the IARC. The parties' dispute essentially centers on the evidentiary threshold that Section 607.055 imposes on a claimant to trigger the rebuttable presumption. For the reasons expressed below, we conclude that, to trigger the "fire-fighter's presumption" that a cancerous condition developed in and originated from the course and scope of his employment, Section 607.055 requires

that a claimant must establish a general causal link between his cancer and the specific exposures listed in the statute.

To determine a statute's meaning, we begin with the text. *BankDirect Capital Fin., LLC v. Plasma Fab, LLC*, 519 S.W.3d 76, 80 (Tex. 2017) ("The Legislature 'expresses its intent by the words it enacts and declares to be the law.'") (quoting *Molinet v. Kimbrell*, 356 S.W.3d 407, 414 (Tex. 2011)); *TGS-NOPEC*, 340 S.W.3d at 439 (citing GOV'T § 312.003). The subsections of Section 607.055 interrelatedly communicate the meaning of the statute; however, they must be read closely together. As we will explain, subsections (a)(1) and (a)(2) set forth the specific circumstances and type of injury that the statute covers. Informed by these subsections, subsection (b) establishes the standard of proof that a claimant is required to meet to trigger the presumption of causation. *See* GOV'T § 607.055.

The first part of Section 607.055 generally establishes the presumption and limits the class of qualified personnel to whom it applies to those who "regularly responded" to the scene of fires or toxic exposures—that is, the presumption applies to field personnel not, for example, fire department employees who work in administrative positions and do not respond to fires or toxic exposures. *See* GOV'T § 607.055(a)(1). But more than that, this part of the statute connects covered injuries to specific *work-related* activities.

Subsection (a)(1) provides that the presumption applies to firefighters and emergency medical technicians who "regularly responded on the scene to calls involving fires or fire fighting" or to events "involving the documented release of radiation or a known or suspected carcinogen while the person was employed as a firefighter or emergency medical technician." *Id.* In other words, subsection (a)(1) addresses the *work-related* activities that this section covers: a claimant must have

"regularly responded" to these types of calls, that is, *in the person's professional capacity* as either a firefighter or an emergency medical technician.

Other sections in Subchapter B are similarly organized. For example, just as Section 607.055 addresses *work-related* activities that may involve cancer-causing exposures, Section 607.056 addresses specific work-related activities that may induce acute myocardial infarctions or strokes. *See* GOV'T § 607.056. Namely, Section 607.056 requires that the claimant "was engaged in a situation that involved nonroutine stressful or strenuous physical activity" that involved fire suppression, rescue, and other emergency response activities, or participated in a training exercise that involved "nonroutine stressful or strenuous physical activity." *Id.* § 607.056(a)(1).

Sections 607.052 and 607.057 also explicitly connect all the presumptions created by Subchapter B to *work-related* benefits. Section 607.052 specifies that "[a] presumption under this subchapter does not apply . . . in a cause of action brought in a state or federal court except for judicial review of a proceeding in which there has been a grant or denial of employment-related benefits or compensation." GOV'T § 607.052(b)(2). Section 607.057 provides that the presumption under this subchapter "applies to a determination of whether a firefighter's or emergency medical technician's disability or death resulted from a disease or illness contracted in the course and scope of employment for purposes of benefits or compensation provided under another employee benefit, law, or plan, including a pension plan." *Id.* § 607.057. Subsection (a)(1) institutes the first point of connection that a claimant must show to trigger the presumption: the claimant must have regularly participated in specific, *work-related* activities.

Subsection (a)(2) establishes the next requirement and connects it to the requirement imposed by subsection (a)(1). Subsection (a)(2) addresses the cancers

15

that a claimant may have suffered: one that is "known to be associated with firefighting or exposure to heat, smoke, radiation, or a known or suspected carcinogen, as described by Subsection (b)." *Id.* § 607.055(a)(2).

We first note that the distinct and consistent spellings of the noun "firefighter" and the verb "fire fighting" as used in subsections (a)(1) and (a)(2) and throughout Subchapter B indicates that, for the purposes of the subchapter, involvement in "fire fighting" is an action that is not necessarily restricted to firefighters. *See, e.g.*, GOV'T § 607.051 (defining "firefighter"); *In re Centerpoint Energy Houston Elec., LLC*, 629 S.W.3d 149, 158–59 (Tex. 2021) (orig. proceeding) (quoting *In re Commitment of Bluitt*, 605 S.W.3d 199, 203 (Tex. 2020)); *Colorado Cnty. v. Staff*, 510 S.W.3d 435, 452 (Tex. 2017) ("Whenever a legislature has used a word in a statute in one sense and with one meaning, and subsequently uses the same word in legislating on the same subject-matter, it will be understood as using it in the same sense, unless there be something in the context or the nature of things to indicate that it intended a different meaning thereby."); *Maypole v. Acadian Ambulance Serv., Inc.*, 647 S.W.3d 533, 543–44 (Tex. App.—Dallas 2022, pet. dism'd) ("[W]e presume the Legislature chose the statute's language with care, purposefully choosing each word, while purposefully omitting words not chosen."). Indeed, the statute covers both firefighters *and* emergency medical technicians. Although a person may function in both capacities—as Michael did—the professions are separate and distinct categories, both in practice and in the text of Section 607.055. Thus, it is *the action of* firefighting that subsection (a)(2) addresses, which is different from the *occupation* of firefighting, although each role is closely related. This broader language allows the statute to cover more claimants, while still restricting its coverage to those professionals who qualify under each of the statute's requirements.

Further, the requirements of subsection (a)(2) sensibly relate to the requirements of the previous subsection: the listed exposures and the *action of firefighting* are the types of occurrences that arise *during* such *work-related* activities such as the ones that are listed in subsection (a)(1).

As Appellees have emphasized, subsection (a)(2) is phrased in the disjunctive; that is, firefighting and the listed exposures are distinct categories. *See MBank Abilene, N.A. v. Westwood Energy, Inc.*, 723 S.W.2d 246, 251 (Tex. App.—Eastland 1986, no pet.) ("The general rule of statutory construction is that the words 'and' and 'or' are not interchangeable.") (citing *Bd. of Ins. Comm'rs of Tex. v. Guardian Life Ins. Co. of Tex.*, 180 S.W.2d 906, 908 (Tex. 1944)); Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts* 116 (2012) ("Under the conjunctive/disjunctive canon, *and* combines items while *or* creates alternatives."). So, for the presumption to apply, the cancerous condition must be known to be associated with either (1) firefighting, *or* (2) the exposure to heat, smoke, radiation, or a known or suspected carcinogen, as described by subsection (b). *See* GOV'T § 607.055(a)(2). This disjunctive component further defines the statute's scope by describing the types of covered cancers themselves.

The broad language of subsection (a)(2) covers a wide range of possible etiologies: any cancer that is known to be associated with firefighting or exposure to heat, smoke, radiation, or a known or suspected carcinogen. Read literally, this language is almost illimitably broad—the dictionary definition of "carcinogen" is "a substance or agent causing cancer."[5] *Carcinogen*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2003). But such a reading, that the presumption applies to cancers that may be caused by the exposure to a substance or agent that

---

[5]To determine the common, ordinary meaning of a statutory term, we typically first look to dictionary definitions. *Silguero v. CSL Plasma, Inc.*, 579 S.W.3d 53, 60 (Tex. 2019); *Fort Worth Transp. Auth.*, 547 S.W.3d at 838.

causes cancer, is so broad that it impermissibly encompasses the other listed exposures in the statute so as to render them superfluous. *See City of San Antonio*, 111 S.W.3d at 29 ("[When possible,] effect must be given to every sentence, clause, and word of a statute so that no part thereof be rendered superfluous or inoperative.") (quoting *Spence v. Fenchler*, 180 S.W. 597, 601 (Tex. 1915)).

Moreover, the broad term "known or suspected carcinogen" follows a list of more specific exposures: heat, smoke, and radiation. "When general words follow specific, enumerated categories, we limit the general words' application to the same kind or class of categories as those expressly mentioned." *City of Houston v. Bates*, 406 S.W.3d 539, 545 (Tex. 2013) (citing *City of San Antonio*, 111 S.W.3d at 29). This statutory construction aid—*ejusdem generis*—requires that we construe words no more broadly than the legislature intended. *Id.* (citing *Marks v. St. Luke's Episcopal Hosp.*, 319 S.W.3d 658, 663 (Tex. 2010)); Scalia & Garner, *Reading Law* 199 ("When the initial terms all belong to an obvious and readily identifiable genus, one presumes that the speaker or writer has that category in mind for the entire passage."). Thus, because the list of exposures is not unlimited but informed by the more specific terms included within it, the carcinogens covered under the statute are only those that are associated with heat, smoke, radiation, and other exposures fairly within the list's genus. *City of Houston*, 406 S.W.3d at 545; *see* Scalia & Garner, *Reading Law* 199–200, 204–13.

The parameters of the listed exposures also may be refined by reference to other words in the statute that are associated with them. *City of Houston*, 406 S.W.3d at 545 ("[T]he meaning of particular words in a statute may be ascertained by reference to other words associated with them in the same statute."); Scalia & Garner, *Reading Law* 195 ("[*N*]*oscitur a sociis* [the associated-words canon] means . . . [w]hen several . . . words . . . are associated in a context suggesting that the words

18

have something in common, they should be assigned a permissible meaning that makes them similar."). As such, although listed in the disjunctive, the other cancer-associated activity enumerated in subsection (a)(2), firefighting, further informs the meaning of the list of covered exposures. The two are not the same—cancers known to be associated with firefighting could include, for example, lifestyle or behavioral factors that do not involve toxic exposures—but they are closely related and should be read as such.

Lastly, the third portion of the statute, subsection (b), provides the standard of proof that a claimant must meet to establish that he is entitled to the statutory causation presumption. Subsection (b) decrees that the presumption applies only to cancers that "*may be caused by*" the listed exposures "*as determined by*" the IARC. GOV'T § 607.055(b) (emphasis added). Subchapter B does not define either "may be caused by" or "as determined by." Consequently, we must construe and apply each phrase's common, ordinary meaning unless a contrary meaning is apparent from the statute's language and context.[6] *Tex. State Bd. of Exam'rs of Marriage & Family Therapists v. Tex. Medical Ass'n*, 511 S.W.3d 28, 34 (Tex. 2017) (citing *Univ. of Tex. at Arlington v. Williams*, 459 S.W.3d 48, 52 (Tex. 2015)); *see* GOV'T § 311.011. Statutory language should be construed according to common usage and phrases that have acquired a particular meaning—whether by definition or otherwise—should be construed accordingly. *See Amazon.com, Inc. v. McMillan*, 625 S.W.3d 101, 106 (Tex. 2021) (citing GOV'T § 311.011).

We begin with the first phrase: "may be caused by." Black's Law Dictionary defines "may" as "[t]o be a possibility." *May*, BLACK'S LAW DICTIONARY (11th ed.

---

[6]The Government Code provides that, unless the context in which the word or phrase appears necessarily requires a different construction, the term "may" "creates discretionary authority or grants permission or a power." GOV'T § 311.016. Here, the context indicates a different meaning.

2019). Merriam-Webster defines "may" as to "have the ability to," to "have permission to," or to "indicate possibility or probability." *May*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2003). Not surprisingly, there are several definitions associated with the term "cause" in Black's Law Dictionary, most of which bear some specific legal meaning in connection to one doctrine or another. *Cause*, BLACK'S LAW DICTIONARY (11th ed. 2019). But the first denoted definition is straightforward: "Something that produces an effect or result." *Id.* Merriam-Webster similarly defines "cause" as "something that brings about an effect or result." *Cause*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2003).

Section 607.055 directly identifies toxic exposure as a primary cancer hazard for firefighters and provides a presumption of causation for firefighters if their cancer is of a type that "may be caused by" such exposure. This context mirrors the traditional toxic exposure tort[7] case, in which a plaintiff typically must prove general and specific causation.[8] *See, e.g.*, *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 714–21 (Tex. 1997). To establish general causation a toxic-tort plaintiff must demonstrate that the substance to which he has been exposed is capable of causing the plaintiff's medical condition in the general population. *Id.* To establish specific causation the plaintiff must prove that the toxic substance caused the plaintiff's particular injury. *Id.*; *see Helena Chem. Co. v. Cox*, 664 S.W.3d 66, 76 (Tex. 2023) ("[T]he minimal facts necessary to demonstrate specific causation include scientific

---

[7]Workers' compensation is not a subset of tort law. *See, e.g.*, *Berkel & Co. Contractors, Inc. v. Lee*, 612 S.W.3d 280, 281 (Tex. 2020) (explaining the exclusivity of the Workers' Compensation Act and the Act's narrow common-law exception for certain intentional torts); 1 LEX K. LARSON, LARSON'S WORKERS' COMPENSATION, DESK EDITION § 1.03[7] (Matthew Bender Rev. Ed.) (2023) ("[T]ort litigation is an adversary contest to right a wrong between the contestants; workers' compensation is a system, not a contest, to supply security to injured workers and distribute the cost to the consumers of the product.").

[8]General and specific causation are not separate elements. They are analytical categories that courts may use to evaluate proof of "but for" causation. *See* RESTATEMENT (THIRD) OF TORTS: LIAB. FOR PHYSICAL AND EMOTIONAL HARM § 28 cmt. c(1) (2010).

knowledge of the harmful level of exposure to a chemical, plus knowledge that the plaintiff was exposed to such quantities.") (internal quotation marks omitted).

Appellees contend that the burden rests with the City to prove that pancreatic cancer is *not* a covered condition under Section 607.055. However, and contrary to their contention, Section 607.055 clearly places the initial burden of establishing general causation on the claimant: he must show that, *as determined by the IARC*, the specific exposures listed in the statute are capable of producing the type of cancer from which he suffers.

Nevertheless, subsection (b) does not require that the claimant must prove that these exposures actually caused his cancer, i.e., establish specific causation. After a claimant has established that his cancer is of the type that may be caused by the listed exposures, as determined by the IARC, he is presumed to have developed the cancer in the course and scope of his employment. However, the claimant's employer may rebut the presumption "through a showing by a preponderance of the evidence that a risk factor, accident, hazard, or other cause not associated with the individual's service as a firefighter or emergency medical technician caused the individual's disease or illness." GOV'T § 607.058. Thus, by enacting Sections 607.055 and 607.058, the legislature shifted the burden of proving *specific causation* to the claimant's employer.

Crucially, the second phrase—"as determined by the [IARC]"—defines the scope of subsection (b). We agree with the City's uncontested argument that, according to Merriam-Webster, "determine" means "to find out or come to a decision about by investigation, reasoning, or calculation." *Determine*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2003). Black's Law Dictionary does not include a definition of "determine" but defines "determination" as "[t]he act of

deciding something officially." *Determination*, BLACK'S LAW DICTIONARY (11th ed. 2019).

Generally, as toxic-tort exposure cases have repeatedly demonstrated, there is a greater inherent uncertainty in determining agent-disease causation than is encountered in more traditional traumatic injuries (resulting, for example, from a vehicular accident), due to the relative absence of knowledge about the mechanisms involved in disease causation.[9] Rather than adopting the judicially-constructed approach to proving causation that courts utilize in toxic exposure cases—in which the parties marshal their own evidence (by using favorable epidemiological studies, hired expert witnesses, etc.)—to cases that involve the application of Section 607.055, the legislature has mandated that the parties to the dispute must rely on the *scientific determinations of the IARC*. The statute's express language leaves no room for the use or application of other scientific materials or analyses in this inquiry. The standard solely depends on what *the IARC has determined*, not what the broader scientific consensus may or may not advocate. Thus, Section 607.055 unambiguously dictates that *the determinations made by the IARC* are the *exclusive* source of evidence that a claimant must rely on and use to establish general causation and to trigger the presumption. GOV'T § 607.055(b).

---

[9]*See, e.g.*, *Havner*, 953 S.W.2d at 718 ("We recognize . . . that a disease or condition either is or is not caused by exposure to a suspected agent and that frequency data, such as the incidence of adverse effects in the general population when exposed, cannot indicate the actual cause of a given individual's disease or condition."). This has required courts to adapt traditional standards of proof in these contexts; the reliance on evidence of epidemiological studies and statistical probability has become the standard of causation in toxic tort cases. *See id.* at 715 ("[C]laimants may attempt to demonstrate that exposure to the substance at issue increases the risk of their particular injury. . . . [s]uch a theory concedes that science cannot tell us what caused a particular plaintiff's injury."). In the toxic tort context, recognizing that "there is no precise fit between science and the legal burdens of proof," the Texas Supreme Court has concluded that epidemiological studies that show a doubling of the risk after the exposure to a substance may be evidence of causation. *BIC Pen Corp. v. Carter*, 346 S.W.3d 533, 545 (Tex. 2011) (citing *Havner*, 953 S.W.2d at 717). For example, if the number of people who take a drug and contract a particular disease is more than double the number of people who contracted the disease but did not use the drug, then it may be statistically more likely than not that a given individual's disease was caused by the drug's use. *Id.*

The importance of this limitation cannot be ignored. If proving general causation—that a listed exposure is *capable* of causing the subject cancer—is generally subject to a low bar, limiting the scientific sources that a claimant must rely on and use to establish his initial burden raises that bar in significant ways.

One important effect of the claimant's burden and the legislature's referral and deference to the IARC is that by its nature the "determination" that a cancer falls within the scope of the statute must be a clear and *affirmative* determination. If the IARC's material does not yield evidence that permits the agency to affirmatively determine, after thorough research and investigation, a cancer's provenance, a claimant cannot then avoid the standard by claiming the opposite—that, under the theory of general causation, any exposure *may* be capable of causing *any* cancer until the IARC affirmatively has determined that it may *not*. Rather, the legislature's referral and deference to the IARC and its findings and determinations narrowed the broad parameters of general causation in favor of a requirement that is specifically tailored for the narrow circumstances addressed by Subchapter B. Therefore, the initial burden is on the claimant to establish that the IARC *has determined* that his cancer "may be caused by" the exposures listed in subsection (b). By their nature, scientific inquiries into agent-disease causation are inherently uncertain. *See, e.g.*, *Havner*, 953 S.W.2d at 717–18. But as the Texas Supreme Court once stated in the toxic tort context: "Just because we cannot rule anything out does not mean we can rule everything in." *Bostic v. Georgia-Pacific Corp.*, 439 S.W.3d 332, 341, 358 (Tex. 2014) (citation omitted). Unfortunately for Appellees, our conclusion stands in stark contrast to the appeals panel decisions relied upon by them and the hearing officer in the administrative phase of Michael's case. In those decisions, the appeals panel simply misapplied the effect of the statutory presumption.

Often, the only effect of a presumption is to shift the burden of *producing* evidence to the party against whom the presumption operates. *See, e.g.*, *Saenz*, 873 S.W.2d at 359 (citing *Combined Am. Ins. Co. v. Blanton*, 353 S.W.2d 847, 849 (Tex. 1962)). Some presumptions, however, shift the burden of *persuasion* as well. *See, e.g.*, *Weed v. Frost Bank*, 565 S.W.3d 397, 412–13 (Tex. App.—San Antonio 2018, pet. denied) (citing *Steven Goode & Olin Guy Wellborn III,* 1 *Texas Practice: Texas Rules of Evidence* § 301.2 (4th ed. 2016)); *see also* 21B CHARLES ALAN WRIGHT & KENNETH W. GRAHAM, JR., FEDERAL PRACTICE AND PROCEDURE § 5122.1 (2d ed. 2023) (discussing the competing "Thayer-Wigmore" and "Morgan-McCormick" theories of presumptions).

The "firefighter's presumption" is of the latter type, contrary to the appeals panels' previous conclusions. Although the statutory scheme shifts this burden of proof from the claimant to the employer, it does so by requiring the employer to *rebut* the presumption (after it is triggered) by establishing, by a preponderance of the evidence, that a risk factor, accident, hazard, or other cause not associated with the claimant's service as a firefighter caused his cancer. *See* GOV'T § 607.058; *see also In re Lipsky*, 460 S.W.3d 579, 589 (Tex. 2015) ("[C]ivil cases typically apply the preponderance-of-the-evidence standard, that is, a fact-finder's determination that the plaintiff's version of the events is more likely than not true."). As we have concluded, this scheme leaves to the claimant the initial burden to prove that his cancer is covered by the statute.

This misunderstanding explains the result in the second appeals panel's decision that the hearing officer cited and relied on in making its determination in Michael's administrative proceeding. There, in a remarkably similar fact-pattern, the TWI-DWC's appeals division ultimately concluded that the 98th Monograph established that Section 607.055 covered pancreatic cancer. We discuss the 98th

24

Monograph and IARC-produced research and evidence below. Here, it suffices to recognize that, in its prior decision that addressed whether pancreatic cancer was a covered condition under Section 607.055, the appeals panel proceeded from the outset under an incorrect application of the statute. Therefore, we disapprove of the appeals division's prior decisions on this subject. Moreover, the decision of the contested-case-hearing officer in Michael's case, as well as the appeals panel's adoption of that decision, are similarly flawed and therefore rejected.

For these reasons, we conclude that Section 607.055 imposes the initial burden on claimants to establish, by exclusively relying on IARC materials and determinations, a general causal link between (1) the cancer from which they suffer and (2) the associated firefighting or exposure to heat, smoke, radiation, or a known or suspected carcinogen.

### C. *IARC Research*

#### 1. *General Overview – The Preamble*

The IARC is the cancer research agency of the World Health Organization. The IARC conducts critical reviews and evaluations on the carcinogenicity of a wide range of human exposures. These are done by a working group of experts in the subject field and the IARC publishes the results of this working group's evaluations in monographs. Each IARC monograph contains the same standard preamble, which describes the objectives and scope of the program, the scientific principles and procedures used in developing a monograph, the types of evidence considered, and the scientific criteria that will guide the evaluations. The IARC recommends that readers should consult the preamble when reviewing a monograph.

The preamble states that the monographs "represent the first step in carcinogen risk assessment," which involves the examination of all the relevant information in order to assess the strength of the available evidence that an agent

could alter the age-specific incident of the development of cancer in humans. Further, the monographs may indicate if additional research efforts are needed, specifically when data immediately relevant to an evaluation is not available.

Each IARC monograph identifies a carcinogenic agent or agents to be studied through an evaluation of the available scientific literature on the agent or agents. Agents can be categorized as specific chemicals, groups of related chemicals, complex mixtures, occupational or environmental exposures, cultural or behavioral practices, biological organisms, or physical agents. These agents are selected for review on the basis that there is evidence of human exposure to the agent and some evidence or suspicion of the agent's carcinogenicity.

The data and the various types of studies of cancer in humans that a monograph working group may evaluate in its scientific review is described, including cohort studies, case-control studies, correlation studies, and intervention studies. Monographs may also examine meta-analyses and pooled analyses, or may commission their own meta-analysis or pooled analysis to gain insight from the results of multiple individual studies. The preamble considers the quality of studies that are evaluated in order to take into account the possible roles of bias, confounding, and chance in the interpretation of epidemiological studies. An extensive description is provided of the "criteria for causality" that is utilized by the authors of IARC monographs in evaluating whether the strength of the evidence as to an agent, such as the occupation of firefighting, is carcinogenic to humans.

A monograph's overall evaluation of the carcinogenicity of an agent— marshalling the evidence from exposure data, studies of cancer in humans, studies in experimental animals, and other data—is categorized by "groups" and associated risk levels. A Group 1 agent is carcinogenic to humans. A Group 2A agent is "probably carcinogenic to humans." A Group 2B agent is "possibly carcinogenic to

humans." A Group 3 agent is "not classifiable as to its carcinogenicity to humans." And a Group 4 agent is "probably not carcinogenic to humans."

## 2. *The Scope of IARC Monographs*

Several important points arise from the preamble's general description of the IARC's approach to its research and the publication of that research.

First, each monograph reviews all pertinent epidemiological studies; however, studies that are determined to be inadequate or irrelevant to the evaluation may be cited but not summarized. For the data that is evaluated for the monographs, the "[i]nclusion of a study does not imply acceptance of the adequacy of the study design or of the analysis and interpretation of the results." As for the study of exposure data for occupations, such "information is given about all agents known to be present."

Second, each monograph summarizes the results of each component part of its scientific review, such as exposure data, cancer in humans, cancer in experimental animals, and other data. For cancer in humans, the "[r]esults of epidemiological studies pertinent to an assessment of human carcinogenicity are summarized . . . [and] target organ(s) or tissue(s) in which an increase in cancer was observed is identified."

Third, with respect to a monograph's summary of the evidence that is relevant to carcinogenicity from studies in humans, the following classifications are assigned: (1) sufficient evidence, (2) limited evidence, (3) inadequate evidence, or (4) evidence suggesting a lack of carcinogenicity. When an agent is classified as demonstrating sufficient evidence of carcinogenicity, the monograph will include a separate, follow-up sentence that identifies the target organ(s) or tissue(s) where an increased risk of cancer was observed in humans. However, the "[i]dentification of a specific target organ or tissue does not preclude the possibility that the agent may cause cancer at other sites." A "limited evidence" classification means that "[a]

positive association has been observed between [the] exposure to the agent and cancer for which a causal interpretation is considered by the Working Group to be credible, but chance, bias or confounding could not be ruled out with reasonable confidence."

Finally, the preamble also notes:

[i]n some instances, the above categories may be used to classify the degree of evidence related to carcinogenicity in specific organs or tissues.

When the available epidemiological studies pertain to a[n] . . . occupation . . . the Working Group seeks to identify the specific agent considered most likely to be responsible for any excess risk. The evaluation is focused as narrowly as the available data on exposure and other aspects permit.

3. *The 98th Monograph*

The primary IARC material relied upon by the parties is the 98th Monograph (the Monograph); this publication evaluated the occupational cancer hazards of painting, firefighting, and shiftwork. Needless to say, the Monograph is voluminous and densely detailed. The section that addresses firefighting explains that firefighting as an occupation encompasses a sweeping assortment of exposures, including exposures to various categories of fires—municipal, wildland, industrial, aviation, military, and oil industry—that may involve many different chemical agents, which in turn can pose an array of carcinogenic impacts on firefighters, ranging from severe to negligible. As a result, the numerous scientific studies, which the Monograph's authors cover in the Monograph, employ widely diverse methods, varying units of measurement and study populations, and numerous other variables. This diversity, they explain, complicates their ability to obtain data that is broadly applicable across the occupation of firefighting. The integration of individual studies into larger meta-analyses—the primary vehicle used by the authors to

measure and evaluate hazardous, carcinogenic exposures—is an inherently limited endeavor due to the heterogenous data available to them.

The Monograph's authors acknowledge that reaching a uniform characterization of firefighter exposure to carcinogens contained in fire and smoke is universally challenging because of differences in firefighter work schedules, the amount of time they actually spend around fires, intermittent exposures, their exposure to complex mixtures of gases, vapors, and particular matter, the unknown effects of heat, and many other unknown or understudied effects such as the absorption of gases and free radicals into particulate matter. In sum, the Monograph candidly states that the occupational hazard of carcinogenic exposures in firefighting is fundamentally and unavoidably difficult to measure because it involves a substantial diversity of circumstances, both in the human aspects involved and in the unique nature of the exposures.

Nevertheless, after examining exposure data, studies of cancer in firefighters, and mechanistic (the mechanics of chemicals interacting with the human body, including absorption, distribution, metabolism, and excretion) and other data (such as genetic effects), the authors of the Monograph concluded that, based on the available evidence they considered to be reliable, there is "limited evidence" of the development of cancer in humans as it relates to the occupational exposure as a firefighter. "Limited Evidence" is defined in the publication as "[a] positive association [that] has been observed between [the] exposure to the agent [firefighting] and cancer for which a causal interpretation is considered by the working group to be credible, but chance, bias or confounding could not be ruled out with reasonable confidence." As for its overall evaluation of firefighting as an occupation, the Monograph concluded that firefighting could be categorized as "possibly carcinogenic to humans."

In the Monograph's section that addressed the studies of cancer in humans that is related to firefighting, the working group examined a variety of studies, including cohort, case-control, descriptive, case reports, and meta-analyses. Importantly for purposes of this case, the working group examined a meta-analysis—the LeMasters study—which incorporated many of the individual studies that the working group evaluated respectively. LeMasters found a significantly elevated risk of cancer for firefighters at ten cancer sites, *none of which involved the pancreas*. After further studies, the working group concluded that only four of the ten designated sites should not be excluded. The working group then performed its own meta-analysis, incorporating LeMasters and two additional large studies of cancer in firefighters that were published after LeMasters was conducted. Based on the working group's meta-analysis, the group concluded that three of the four cancer sites remained statistically significant for cancer risks: (1) testicular, (2) prostatic, and (3) non-Hodgkin's lymphoma.

In their findings and data summary, the working group stated that "[e]levated relative risks for cancer at many different sites were identified by one or more studies, but few were observed consistently," and that only three types of cancer showed significant risk estimates: testicular, prostatic, and non-Hodgkin's lymphoma. The working group acknowledged the limitations of its conclusions:

> [a]lthough firefighters are exposed concurrently to a multitude of chemical compounds that include numerous carcinogens, human epidemiological studies at best used indirect (poor) measurements of exposure to such agents. Also, exposures of firefighters vary considerably depending on job activities, and only crude measures of exposure, such as duration of employment and number of [fire] runs, have been used in these studies. Despite these limitations, increased risks for *some* cancers were found for firefighters in the meta-analysis.

(Emphasis added). The working group also noted a variety of other limitations in their evaluation of the overall human carcinogenicity of firefighting because of the

lack of data and insufficient studies on factors such as the effects of smoke, genotoxic effects, and inflammatory respiratory effects on firefighters.

In sum, the authors of the Monograph concluded that the widely varied nature of firefighting as an occupation, as well as the lack of studies and data for some relevant factors, limited their ability to measure the human carcinogenicity that is associated with the occupation—which resulted in the Monograph's overall evaluation that "[t]here is *limited evidence* in humans for the carcinogenicity of occupational exposure as a firefighter" and that occupational exposure as a firefighter could only be classified as "possibly carcinogenic to humans." Despite these limitations, the authors concluded that only three types of cancers were associated with an elevated occupational risk in firefighting—testicular, prostatic, and non-Hodgkin's lymphoma. Significant to our analysis, pancreatic cancer was not identified as a type of cancer that is associated with the occupational risk of firefighting. The effect of this IARC *determination* is inescapable—as of the publication of the 98th Monograph, pancreatic cancer is *not* a type of cancer that is connected to or "*may be caused by*" firefighting, its work-related activities, or its related exposures.

D. *The Parties' Summary Judgment Evidence*

With this background in mind, we turn now to whether either party has carried their burden to establish that they are entitled to summary judgment.

1. *The City's Evidence*

In their first issue, the City contends that the trial court abused its discretion when it excluded portions of their summary judgment evidence. Alternatively, the City argues that, irrespective of the trial court's ruling, their admitted summary judgment evidence conclusively establishes that the IARC has not made the relevant determination regarding the development of pancreatic cancer as it relates to

firefighter activities, and that we should, therefore, reverse the trial court's judgment and render summary judgment in its favor.

In addition to the Monograph, the City submitted the following exhibits in support of its motion for summary judgment: (1) a press release by the IARC that summarized the Monograph's findings; (2) an article in *The Lancet Oncology*, a peer-reviewed journal that also summarized the Monograph's findings; (3) the Daniels study, a non-IARC study of mortality and cancer incidence in American firefighters; (4) the LeMasters meta-analysis; (5) a Questions and Answers web page published by the IARC in 2022 that previews its forthcoming monograph which updates the findings of the Monograph;[10] and (6) two affidavits from medical professionals (physicians)—Dr. Suzanne Novak and Dr. Patricia Rosen.

Based on Appellees' objections, the trial court excluded three of the City's exhibits referenced above: (1) the affidavits of Dr. Novak and Dr. Rosen; and (2) the Daniels study—although Dr. Novak relied on the Daniels study in formulating her opinions, the City also proffered it as an independent exhibit. The trial court excluded the affidavits of Dr. Novak and Dr. Rosen on the grounds that their opinions were conclusory, lacked foundation, were outside the scope of their alleged expertise, were an attempt to present legal (rather than factual) conclusions, that they had no personal knowledge of the facts of workers' compensation claims, and that they were not competent to testify to such facts. The trial court excluded the Daniels

---

[10]Notably, this Questions and Answers page indicates that in the IARC's forthcoming (and now published) monograph on occupational exposure as a firefighter (the 132nd Monograph), which is an update to the 98th Monograph, the IARC has upgraded firefighting to "carcinogenic to humans" (its highest category for carcinogenicity) and found that there is "sufficient evidence" for occupational exposure for mesothelioma and bladder cancer in humans, as well as "limited evidence" for colon cancer, prostate cancer, melanoma of the skin, and non-Hodgkin's lymphoma. Although the City urges that this updated monograph supports their argument that pancreatic cancer, by its omission from the monograph's findings, is not associated with firefighting or its occupational exposures, either then or now, we do not consider the information in the updated monograph because it was conducted and published several years after Michael's death.

study on the grounds that it constituted inadmissible hearsay, hearsay within hearsay, lacked relevance and probative value, and that any probative value was substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the factfinder, or needlessly cumulating the evidence.[11]

A witness who is qualified as an expert on the basis of the witness's knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in dispute. TEX. R. EVID. 702. Expert testimony is admissible when (1) the expert is qualified, and (2) the testimony is relevant and based on a reliable foundation. *Cooper Tire & Rubber Co. v. Mendez*, 204 S.W.3d 797, 800 (Tex. 2006); *see* TEX. R. EVID. 702.

If the expert's scientific evidence is not reliable, it is not admissible. *Mendez*, 204 S.W.3d at 800. Courts must determine reliability from all of the evidence. *Havner*, 953 S.W.2d at 720. Expert testimony must also be based on a reliable foundation of scientific or professional technique or principle. *Wiggs v. All Saints Health Sys.*, 124 S.W.3d 407, 410 (Tex. App.—Fort Worth 2003, pet. denied) (citing *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 557 (Tex. 1995)). When the expert's underlying scientific technique or principle is unreliable, the expert's opinion is no more than subjective belief or unsupported speculation and is thus inadmissible. *Id.* Generally, causation opinions that are predicated on possibility, speculation, or surmise do not constitute admissible evidence. *Havner*, 953 S.W.2d at 711–12.

---

[11]Appellees also contend that the excluded evidence is not relevant to the issues on appeal because the City bore the burden to *disprove* that Michael's cancer falls within the requirements of Section 607.055. Our preceding discussion on the meaning of Section 607.055 is directly contrary to this contention. Rather, it is Appellees burden to initially *prove* that Michael's cancer falls within the scope of the statutory requirements.

An expert witness's opinion testimony is conclusory when the opinion has no legitimate basis or when the offered basis provides no support. *City of San Antonio v. Pollock*, 284 S.W.3d 809, 818 (Tex. 2009). Affidavits are conclusory if the facts in the affidavits do not support the proffered conclusions. *Yost v. Jered Custom Homes*, 399 S.W.3d 653, 660 (Tex. App.—Dallas 2013, no pet.). Further, conclusory affidavits are substantively defective and do not raise fact issues. *Ryland Grp., Inc. v. Hood*, 924 S.W.2d 120, 122 (Tex. 1996).

In *Robinson*, the Texas Supreme Court set forth six non-exclusive factors to assist courts in determining whether expert testimony is reliable and, therefore, admissible.[12] *Robinson*, 923 S.W.2d at 557. Although the *Robinson* factors cannot always be used in assessing an expert's reliability, there must be some basis offered to support the expert's opinion to show its reliability. *Mendez*, 204 S.W.3d at 801 (citing *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 726 (Tex. 1998)). In those circumstances, expert testimony is unreliable if there is simply too great of an analytical gap between the data upon which the expert relies and the opinion that is offered. *Mendez*, 204 S.W.3d at 800. A reviewing court is not required to ignore gaps in an expert's analysis or assertions that are simply incorrect, and a trial court is not required to admit evidence that is connected to existing data only by the expert's *ipse dixit*. *Id.* at 800–01. Bald assurances of validity will not suffice. *Havner*, 953 S.W.2d at 712. In the end, the underlying data should be independently evaluated to determine if the opinion itself is reliable. *Id.* at 713.

---

[12]Those factors are: "(1) the extent to which the theory has been or can be tested; (2) the extent to which the technique relies upon the subjective interpretation of the expert; (3) whether the theory has been subjected to peer review and/or publication; (4) the technique's potential rate of error; (5) whether the underlying theory or technique has been generally accepted as valid by the relevant scientific community; and (6) the non-judicial uses which have been made of the theory or technique." *Robinson*, 923 S.W.2d at 557 (internal citations omitted).

The nature of toxic exposure cases typically requires expert testimony to prove causation. *See, e.g.*, *Bostic*, 439 S.W.3d at 347–50; *Merck & Co., Inc v. Garza*, 347 S.W.3d 256, 259, 265–66 (Tex. 2011); *Borg-Warner Corp. v. Flores*, 232 S.W.3d 765, 770–71 (Tex. 2007); *Havner*, 953 S.W.2d at 715–16, 720. Generally, expert testimony is necessary to establish causation as to medical conditions that are outside the common knowledge and experience of lay persons. *See Guevara v. Ferrer*, 247 S.W.3d 662, 665 (Tex. 2007). And where causation is not readily ascertainable from general experience and common sense, expert testimony is required to prove causation. *See Morgan v. Compugraphic Corp.*, 675 S.W.2d 729, 733 (Tex. 1984); *Lenger v. Physician's Gen. Hosp. Inc.*, 455 S.W.2d 703, 708 (Tex. 1970).

Epidemiological studies examine existing populations in an attempt to determine whether an association and correlation exists between a disease or condition and a factor or agent that is suspected of causing that disease or condition. *See Havner*, 953 S.W.2d at 715–20. As discussed above, the IARC uses and relies on epidemiological studies in its cancer research. Here, the City offered the opinions from two medical professionals in support of its argument that the IARC had not, at the time of Michael's injury and claim, determined that pancreatic cancer is a type of cancer that qualifies for the presumption under Section 607.055.

Dr. Suzanne Novak is a licensed physician; she also has medical training in the fields of epidemiology and toxicology. In her affidavit, Dr. Novak testified that she reviewed Michael's medical records and performed independent research relevant to the issues in dispute. She specifically included and referred to the Daniels study as material that supported her opinions and which she relied upon as part of the bases for her opinions. Dr. Novak opined that, based on her review of the Monograph, the IARC had not determined that pancreatic cancer is a type of cancer

that is associated with firefighting or the known or suspected carcinogens associated with that occupation. She noted that the Monograph acknowledged that the occupation of firefighting involved a wide variety of exposures and was challenging to study because of inconsistent and sometimes poor proxies for exposure. Dr. Novak further described the scope and methods employed in IARC monographs, as explained in the IARC preamble, and she summarized the specific methodology used in the Monograph. Dr. Novak concluded that, as of the date of Michael's injury and claim, the IARC "had not made a determination that pancreatic cancer is increased in firefighters." She further stated that "[p]ancreatic cancer is not a type of cancer that is known to be associated with or that may be caused by firefighting or [the] exposure to heat, smoke, radiation, or a known or suspected carcinogen as determined by the [IARC]."

Dr. Patricia Rosen is a licensed physician and is also trained in the fields of epidemiology and toxicology. Dr. Rosen stated in her affidavit that she reviewed Michael's medical history and conducted independent research relevant to the disputed issues. She described the role of the IARC and the scope of the Monograph. Dr. Rosen stated that the only study of the gastrointestinal system evaluated by the authors of the Monograph was performed by Bates in 2007, and she explained that the study's results indicated that there was no increased risk of pancreatic cancer for firefighters as compared to the general population. Dr. Rosen concluded that the data provided by the Monograph does not show an increased risk for pancreatic cancer in the occupation of firefighters.

Based on the substance of their affidavits, it is apparent that Dr. Novak and Dr. Rosen are both qualified to offer their opinions as to the meaning of the decisions, evaluations, and summaries of the Monograph working group. Neither physician's testimony was outside the scope of their expertise because interpreting

a research publication that comprises a review of epidemiological studies of the toxic effects of occupational exposures falls squarely within the realms of toxicology and epidemiology. Their opinions were based on facts and data of which they were aware, had reviewed, and had knowledge and expertise. *See* TEX. R. EVID. 703; *see also* TEX. R. EVID. 602. Moreover, because both physicians based their opinions on the Monograph's results, the IARC's scope and methodology, their independent research, and explained why these materials supported their opinions, their opinions were not conclusory.

Further, neither Dr. Novak's nor Dr. Rosen's opinions are objectionable because they embrace an ultimate issue, such as whether the IARC has determined that pancreatic cancer may be caused by the exposures listed in Section 607.055(b). *See* TEX. R. EVID. 704. The question of whether the IARC has made this or that determination is a mixed question of law and fact, which is a proper subject of expert testimony. *See Birchfield v. Texarkana Mem'l Hosp.*, 747 S.W.2d 361, 365 (Tex. 1987); *Mega Child Care, Inc. v. Tex. Dep't of Protective & Regulatory Servs*, 29 S.W.3d 303, 309 (Tex. App.—Houston [14th Dist.] 2000, no pet.). When, as here, the expert is not a lawyer, the witness must be provided the proper legal concepts with which to analyze the facts. *See Lyondell Petrochemical Co. v. Fluor Daniel, Inc.*, 888 S.W.2d 547, 554 (Tex. App.—Houston [1st Dist.] 1994, writ denied). As demonstrated by the considerations and conclusions in their affidavits, Dr. Novak and Dr. Rosen, in formulating their respective opinions, were properly provided with the appropriate legal standard: whether a cancer *may be caused* by the exposures listed in the statute *as determined* by the IARC.

In this case, the affidavits of Dr. Novak and Dr. Rosen were not offered as evidence to *rebut* the presumption, as Appellees suggest. Rather, they were offered to aid the trial court in its understanding of the IARC research material. *See* TEX. R.

EVID. 702. Absent a valid basis for their exclusion, which Appellees did not offer, the affidavits of Dr. Novak and Dr. Rosen were admissible. Therefore, we conclude that it was an abuse of discretion for the trial court to exclude them.

Not so with the City's third excluded exhibit, the Daniels study. That study is not one that the IARC included in the Monograph or any other IARC material, as far as we are aware. Although the Daniels study references the Monograph and states that the Monograph "reported significant summary risks for prostatic and testicular cancers, and NHL," it is needlessly cumulative. Its only purpose is to state, in a peer-reviewed (but non-IARC) study, what the IARC had determined in the Monograph. But the City's summary judgment evidence already includes the Monograph itself and two other sources that each accomplish the same purpose. The first of these other sources is a press release published by the IARC regarding the Monograph, which states that "[c]onsistent patterns are difficult to discern due to the large variations in exposure across different types of fires and different groups of firefighters. Relative risks were consistently increased, however, for three types of cancer: testicular cancer, prostate cancer, and non-Hodgkin lymphoma." The other source is an article in *The Lancet Oncology*. The IARC press release specifically cites this article, stating that a summary of the conclusions in the Monograph will be published there.

The trial court has the authority to prevent the needless cumulation of evidence under Rule 403. TEX. R. EVID. 403; *see Hooper v. Chittaluru*, 222 S.W.3d 103, 110 (Tex. App.—Houston [14th Dist.] 2006, pet. denied). The decisive factor is whether the excluded evidence would have added substantial weight to the party's case. *Hooper*, 222 S.W.3d at 110. Here, the Daniels study provided nothing that the Monograph and the other two mentioned exhibits did not already supply.

Therefore, we conclude that the trial court did not abuse its discretion when it excluded this exhibit.

Accordingly, for the reasons stated above, we sustain the City's first issue in part and overrule it in part.

## 2. *Appellees' IARC Evidence*

Appellees argue that several studies identified in the Monograph mention an association between pancreatic cancer and the occupation of firefighting—the Guidotti study, the Ma (1998) study, and the Gallagher study—which constitutes evidence that the IARC has determined that firefighting and its related exposures may cause pancreatic cancer. However, other than simply referring to these studies, Appellees did not offer any expert testimony or opinions in support of this or any other assertion that they have advanced.

The IARC preamble specifically states that every IARC monograph reviews all pertinent epidemiological studies; however, studies that are determined to be inadequate or irrelevant to the evaluation may be cited in the monograph but not summarized. Moreover, with the data that is evaluated for the monographs, the preamble explains that "[i]nclusion of a study does not imply acceptance of the adequacy of the study design or of the analysis and interpretation of the results." In fact, the LeMasters meta-analysis, which included each of the three studies cited above by Appellees, concluded that the association of pancreatic cancer and the occupation of firefighting was "unlikely," considering the available data. In contrast, other cancer sites were characterized as "possible" and "probable."

The IARC conducted an additional meta-analysis that incorporated LeMasters as well as other and more recent studies. The results of this meta-analysis only *narrowed* the number of cancer sites that the working group found to be statistically significant for an increased risk. Thus, the authors of the Monograph appear to have

rejected the studies upon which Appellees rely from their consideration and final, overall evaluation of the available studies of cancer in humans that are connected to the occupation of firefighting.

As the City's experts opined, the Monograph concluded that reliable findings existed for only three types of cancers or cancer sites that could be related to the occupation of firefighting. It is true that the IARC's preamble generally qualifies all findings, and the Monograph specifically acknowledges that the measurements of exposure used in human epidemiological studies were generally poor and suggests the need for additional studies regarding the carcinogenicity of firefighting as an occupation. But nothing that Appellees have pointed to in the Monograph indicates that the IARC has *determined* that pancreatic cancer "*may be caused by*" exposure to heat, smoke, radiation, or a known or suspected carcinogen. If some other aspect of the Monograph contains such a finding or determination, we are unaware of it, nor have Appellees directed us to it.

Nor have Appellees directed us to other IARC materials that support their arguments. Appellees briefly mention that the IARC has classified Thorium[232] "and its decay products" as a Group 1 carcinogen. They also assert that formaldehyde is "most often found in smoke from fires" and is classified by the IARC as a Group 1 carcinogen. But in neither instance do Appellees demonstrate that the IARC has *determined* that these substances (1) exist within exposures to heat, smoke, radiation, or a known or suspected carcinogen under the meaning of Section 607.055, and (2) *may cause* pancreatic cancer. Rather, Appellees cite to the Gallagher study, which is referenced within the Monograph, for the proposition that pancreatic cancer has been associated with firefighting. But the Gallagher study was addressed and explicitly rejected by LeMasters and the IARC's own meta-analysis in the Monograph.

Next, Appellees cite to their summary judgment exhibit, which purports to be an IARC-created list of carcinogenic agent classifications by cancer site, to establish that Thorium$^{232}$ is associated with pancreatic cancer. Even if we accepted both of Appellees' points for the sake of argument, these assertions do not establish the required general causal connection because Appellees have failed to connect Thorium$^{232}$ to the exposures listed in the statute through and as *determined* by IARC studies and materials. Nor did Appellees offer any expert testimony or opinions to explain how those connections might exist.[13]

We conclude that Appellees have failed to establish that no genuine issue of material fact exists and that they are entitled to judgment as a matter of law. Section 607.055 imposed the initial burden on Appellees to establish that pancreatic cancer is a condition that *may be caused* by any of the exposures listed in Section 607.055, as *determined by the IARC*. Appellees argue, incorrectly, that the City bears the burden to prove a negative—that pancreatic cancer is *not* a type of cancer that is covered by the statute. This contention misapprehends and misconstrues the intent of the statute and its effect.

Based on the summary judgment evidence presented, we conclude that Appellees have failed to meet their statutory burden. Appellees did not proffer any expert testimony or opinions, or other evidence for that matter, to explain and support their nuanced argument that individual studies within the Monograph indicate that the IARC has "determined" pancreatic cancer to be a type of cancer that

---

[13]Appellees proffered the affidavit of former Texas Senator Robert Deuell, the author and sponsor of the bill that led to the enactment of the statute in 2005, which incorporated the firefighter's presumption. Deuell stated that he had been informed that certain entities were interpreting the application of the cancer presumption statute to be limited to only three cancers: testicular, prostate, and non-Hodgkin's lymphoma. He stated in response: "This interpretation of the law is not correct. The statute was intended for any type of cancer that may be caused by exposure to heat, smoke, radiation, or a known or suspected carcinogen as determined by the International Agency for Research on Cancer." Regardless of any infirmities in this evidence, Deuell's statement neither contradicts our interpretation of the statute nor supports Appellees' argument that his statements are evidence of an IARC determination.

is covered by the statute. This same deficiency dooms Appellees' other arguments regarding IARC materials that are beyond the scope of the Monograph. The non-IARC materials upon which Appellees rely are not competent evidence under the statute, and, as we have said, the prior appeals panel decisions cited by them are grounded on a fundamentally flawed understanding and application of the statute. Thus, Appellees' summary judgment evidence rests solely on unsupported assertions based on their interpretation of scientific data. This evidence fails to establish that Appellees are entitled to judgment as a matter of law. To invoke the "firefighter's presumption" in this case, Appellees' reliance must find some support in a *determination* made by the IARC. Here, there is none.

On the other hand, the City presented the affidavits of two qualified experts, each of whom opined that the IARC has not determined that pancreatic cancer is a type of cancer that is covered by the statute. The City also presented the entire Monograph and other related IARC materials, which explain the overall conclusions of the Monograph. This evidence, which Appellees have not controverted, conclusively supports the City's argument that pancreatic cancer is *not* a covered condition under the statute. Appellees have offered no competent summary judgment evidence to the contrary, although they bear the burden to establish that pancreatic cancer is statutorily covered.

In light of our interpretation of Section 607.055, and the record before us, we conclude that Michael did not sustain a compensable injury in the form of an occupational disease under Chapter 607 of the Government Code. Moreover, the presumption of causation articulated in Section 607.055 is not applicable to the pancreatic cancer that Michael developed. Because the City has shown that it is entitled to judgment as a matter of law, and Appellees have not, we sustain the City's second issue.

## V. *This Court's Ruling*

For the reasons that we have stated, we reverse the judgment of the trial court and render judgment in favor of the City.[14]

W. STACY TROTTER

JUSTICE

March 7, 2024

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.

---

[14]Our holding today does not diminish the service that Michael provided to the communities in which he served in his roles as a firefighter and EMT.